## UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| *ERNEST EDWARDS, et al.,* | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| *v.* | ) | *Civil No. 04-145-P-H* |
| | ) | |
| *GAME TRACKER INCORPORATED,* | ) | |
| | ) | |
| *Defendant*[1] | ) | |

## RECOMMENDED FINDINGS OF FACT
### AND CONCLUSIONS OF LAW

Plaintiffs Ernest L. ("Joe") Edwards, Jr. ("Mr. Edwards") and Karla Edwards ("Mrs. Edwards") (together, "Plaintiffs") move pursuant to Federal Rule of Civil Procedure 55(b)(2) for a default judgment against defendant Game Tracker Incorporated ("Game Tracker") in this product-liability- and negligence-based personal-injury and loss-of-consortium action. *See* Plaintiff's [sic] Request for Hearing and Default Judgment Fed.R.Civ.P. 55(b)(2) ("Default-Judgment Motion") (Docket No. 36); Complaint.[2]  On November 15, 2005, following notice to Plaintiffs and Game Tracker, a hearing as to damages was held before me at which Plaintiffs appeared, represented by counsel, but no appearance was made by or on behalf of Game Tracker.  Plaintiffs testified and offered three exhibits that were admitted without objection.  I permitted Plaintiffs to submit, post-

---

[1] Plaintiffs also sued Wal-Mart Stores East, LP ("Wal-Mart"), initially misidentified as Wal-Mart Incorporated.  *See* Complaint & Demand for Jury Trial ("Complaint") (Docket No. 1); Answer and Affirmative Defenses of Defendant, Wal-Mart Stores East, LP (Docket No. 4).  Wal-Mart and Plaintiffs subsequently filed a joint motion to dismiss Wal-Mart from the case, which was granted. *See* Docket Nos. 32-34.  I agree with Plaintiffs and Wal-Mart that it is accordingly appropriate to remove Wal-Mart from the caption (*continued on next page*)

hearing, three additional exhibits: a *curriculum vitae* of Allan S. McCausland, Ph.D. ("Plaintiffs' Exh. 4) and copies of two bankruptcy-court orders, Order Vacating Automatic Stay as to Creditor, Karla Edwards, *In re Gametracker, Inc*., Bankr. No. 04-34324 (Bankr. E.D. Mich. Jan. 13, 2006) (Plaintiffs' Exh. 5) and Order Vacating the Automatic Stay, Pusuant [sic] to 11 U.S.C. §362(d) for Cause, *In re Gametracker, Inc*., Bankr. No. 04-34324 (Bankr. E.D. Mich. Apr. 22, 2005) (Plaintiffs' Exh. 6). *See* Order Granting Plaintiffs' Motion for Leave To Supplement Hearing Record (Docket No. 45). With the benefit of the hearing and exhibits, I recommend that the court grant the Default-Judgment Motion and adopt the following proposed findings of fact and conclusions of law.

## I. Proposed Findings of Fact

1.     Mr. Edwards, 57, and Mrs. Edwards, 56, who reside in Minot, Maine, have been married for forty years and have four adult children and eight grandchildren.

2.     On October 11, 2002 Mr. Edwards was preparing to bow-hunt from a tree stand with an adult son when he sustained the fall that is the cause of the injuries of which Plaintiffs complain. Mr. Edwards ascended to the tree stand, fastened a safety belt manufactured by Game Tracker around himself and tethered it to the tree. He checked to make sure it was secure and then let go of the tether. When he did so, the belt unexpectedly opened. Sensing that he was about to fall, Mr. Edwards searched for something to grab but could find nothing. He plummeted approximately seventeen feet to the ground below, turning a somersault on his way down and landing flat on his back.

3.     Mr. Edwards was conscious after he hit the ground. He experienced an immediate onset of pain and had difficulty breathing. He was unable to get up. His son called emergency personnel who immobilized him on a stretcher and transported him by ambulance to St. Mary's Regional Medical Center ("St. Mary's") in Lewiston, Maine.

_____

of this case. *See* Defendant's Agreed Upon Objection to Default Judgment (Docket No. 38).

4.      Upon Mr. Edwards' arrival at St. Mary's, the staff called a Code 11 for multiple trauma. *See* Plaintiffs' Exh. 1(1)(A) at 1. Mr. Edwards was noted to be complaining of a significant amount of back pain, mild to moderate dyspnea and significant pain in his left lateral chest and abdomen. *See id*.[3] He could not move his lower extremities. *See id*. at 2. With the aid of emergency x-rays and CT scans, Joel Franck, M.D., made a diagnosis of multiple trauma, severe thoracic spinal-cord injury with paralysis, complex thoracic-spine T12 comminuted fracture, and multiple spinous-element fractures of the thoracic and lumbar spine. *See* Plaintiffs' Exh. 1(1)(B) at 1-2.[4] Multiple rib fractures, and the presence of a moderate left hemothorax and a huge left psoas retroperitoneal hematoma, also were noted. *See id*. at 2.[5] Mr. Edwards was placed on spinal-cord protocol, and his pain was controlled with morphine. *See* Plaintiffs' Exh. 1(1)(A) at 2.

5.      The following day, October 12, 2002, Dr. Franck performed a more than seven-hour spinal-stabilization surgery that included (i) a T11-12 thoracolumbar laminectomy and decompression for removal of epidural hematoma, (ii) a T8 through T10 and L1 through L3 pedicle screw fixation fusion, (iii) stabilization of T8 through L3 with titanium pedicle screws and rods, (iv) a T11 and T12 double-cross link fixation for nonsegmental translational and rotational stabilization, and (v) T8 through L3 posterolateral lumbar fusions. *See* Plaintiffs' Exhs. 1(1)(C) at 1 & 1(1)(J) at 1.[6]

---

[2] A default was entered against Game Tracker on August 20, 2004 on Plaintiffs' motion. *See* Docket Nos. 7-8.

[3] "Dyspnea" is shortness of breath. *See* Stedman's Medical Dictionary ("Stedman's") 556 (27th ed. 2000).

[4] "Thoracic" means "[r]elating to the thorax." Stedman's at 1828. The "thorax" is "[t]he upper part of the trunk between the neck and the abdomen; it is formed by the 12 thoracic vertebrae, the 12 pairs of ribs, the sternum, and the muscles and fasciae attached to these[.]" *Id*. at 1829. T12 is the bottommost of the twelve thoracic vertebrae. *See id*. at 385. The lumbar vertebrae, "usually five in number, [are] located in the lumbar region of the back[,]" *id*. at 1957, which is "the part of the back and sides between the ribs and the pelvis[,]" *id*. at 1034. A fracture is "comminuted" if broken into several pieces. *See id*. at 386.

[5] A "hemothorax" is blood in the pleural, or lung, cavity. *See* Stedman's at 807. The "psoas" are muscles in the loins. *See id*. at 1474. "Retroperitoneal" is "[e]xternal or posterior to the peritoneum[,]" *id*. at 1563, which is the "sac . . . that lines the abdominal cavity and covers most of the viscera contained therein[,]" *id*. at 1353. A "hematoma" is a mass of blood in a localized area. *See id*. at 796.

[6] A "laminectomy" is "[e]xcision of a vertebral lamina; commonly used to denote removal of the posterior arch[,]" which is "the flattened posterior portion of the vertebral arch extending between the pedicles and the midline[.]" Stedman's at 964. "Decompression" is "[r]emoval of pressure." *Id*. at 462. "Internal fixation" is "stabilization of fractured bony parts by direct f[ixation] to one another with surgical wires, screws, pins, rods, or plates." *Id*. at 682. "Spinal fusion" is "an operative procedure to accomplish (*continued on next page*)

6.      The day afterward, October 13, 2002, Maria Ikossi, M.D., inserted a tube in Mr. Edwards' chest to drain blood from a small hemothorax on his left side, where he had sustained multiple rib fractures.  *See* Plaintiffs' Exhs. 1(1)(D) & 1(1)(G).

7.      Although the operation by Dr. Franck was noted to have gone very well, Mr. Edwards required significant blood transfusions in the days following surgery as a result of decreased hematocrit and coagulopathy.  *See* Plaintiffs' Exh. 1(1)(J) at 2.[7]

8.      Mr. Edwards was discharged from St. Mary's on October 24, 2002 and admitted the same day to the New England Rehabilitation Hospital of Portland ("New England Rehab") in Portland, Maine, where he underwent postoperative rehabilitation until discharged home on November 22, 2002.  *See* Plaintiffs' Exhs. 1(1)(J) at 1 & 1(2)(A) at 1.

9.      When Mr. Edwards first was admitted to the New England Rehab, he was confined to a wheelchair and unable to move his legs.  During his stay there he was not in a great deal of pain because he was heavily sedated; however, he ached and felt his muscles were tight.

10.     Mr. Edwards' understanding when he was transferred to New England Rehab was that he likely never would walk again.  He understood that he was to be taught how to live a wheelchair-bound life.  He managed to maintain a positive outlook mentally and did not become depressed. However, he was upset to think that he was never again going to be the same person he was prior to the accident and that he likely would be unable to resume the kind of physical work he had done all of his life, including work in the construction trade.  He was apprehensive about the future and concerned about his ability to provide for his family.

---

bony ankylosis between two or more vertebrae." *Id*. at 720-21.  "Ankylosis" is "[s]tiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint." *Id*. at 90.
[7] "Hematocrit" is the "[p]ercentage of the volume of a blood sample occupied by cells." Stedman's at 796  "Coagulopathy" is "[a] disease affecting the coagulability of the blood." *Id*. at 371.

11.     During his stay at the New England Rehab Mr. Edwards underwent physical and occupational therapy and participated in training in activities of daily living pursuant to the Spinal Cord Injury pathway, including bladder retraining.  *See* Plaintiffs' Exh. 1(2)(A).  He also was sent for a consultation with Behavioral Medicine for assistance, *inter alia*, in coping strategies.  *See id*. at 1. He did "extremely well with his therapeutic goals, was able to progress . . . out of bed to wheelchair activities and at the time of discharge was able to function at a modified independent level with wheelchair activities."  *Id*.  He gradually regained movement in his legs, commencing with a return of movement in the lower part of his left foot.  He was noted on discharge to have "actually shown neurologic recovery in his lower extremities where he was able to contract all major muscle groups and demonstrate limited active range of motion in his weight bearing joints."  *Id*.

12.     At the time of his discharge home Mr. Edwards was still confined to a wheelchair, although he was able to get up out of it on his own.  Prior to Mr. Edwards' return home, Mrs. Edwards oversaw  renovations to the couple's mobile home, including the addition of a wheelchair ramp and the widening of doors.  A hospital bed and portable toilet were installed for Mr. Edwards' use. Initially, upon his return, Mr. Edwards required what Mrs. Edwards described as "total care," including help dressing, attending to personal hygiene and exercising his legs two to three times a day. He was not able to get into the bathroom because it had not yet been modified.  Mrs. Edwards provided most of his needed care, although the couple's daughter also checked in on them periodically and sometimes took her father to medical appointments.  During this period of time Mr. Edwards' pain continued to be controlled by medications; however, he still felt achy.

13.     For a period of approximately a year Mr. Edwards underwent outpatient physical therapy and swimming-pool therapy two to three times a week, and his progress was monitored by several physicians (including Dr. Franck, Douglas Farrago, M.D., and Ronald E. Snyder, M.D.).  *See*

Plaintiffs' Exhs. 1(4)-(6).   Despite preexisting severe arthritis in his knees, which hampered his progress, *see, e.g.,* Plaintiffs' Exh. 1(2)(B) at 1, he gradually regained strength and mobility.   By January 21, 2003 he was noted to be able to stand and take a few steps at parallel bars  *See id*.  As of March 25, 2003 he was able to walk more than twenty feet and was, overall, "markedly improved since his last visit" two months earlier.  *See* Plaintiffs' Exh. 1(2)(C) at 2.

14.      As Mr. Edwards became stronger he was able to begin walking inside the house using a walker while continuing to use a wheelchair outdoors.  He eventually was able to walk using two cane crutches.  Approximately one year after the accident he weaned himself completely from the wheelchair.  As of October 9, 2003 Dr. Franck described him as "walk[ing] with Canadian crutches and [] totally independent.  He has even gone hunting."  *See* Plaintiffs' Exh. 1(5)(C).  Mr. Edwards continues to walk using either a walker or two cane crutches and continues not to require physical assistance in activities of daily living such as dressing.   However, he cannot walk any distance without crutches and is unlikely ever to be able to walk again unassisted.  Over the past five or six months, Plaintiffs have noticed a regression in Mr. Edwards' abilities.  He does not have as much strength or control as he previously did.  He drags his feet more now and has greater difficulty getting in and out of chairs.

15.      As of April 14, 2003 Mr. Edwards was diagnosed with chronic pain syndrome.  *See* Plaintiffs' Exh. 1(4)(A).  He was prescribed medications to control his pain, including Percocet and Oxycontin.  *See id*. & Plaintiffs' Exh. 1(4)(B).  However, because of side effects, including effects on his memory and bowels, Mr. Edwards eventually stopped taking pain medications.  He experiences pain in the morning, at bedtime and during parts of the day.  He has difficulty sleeping and must change positions because of pain.  He can sleep for only three to four hours at a stretch.

16.     Although Mr. Edwards no longer is prescribed pool therapy, he has continued water therapy on his own, paying for a pool membership.

17.     Prior to the accident Mr. Edwards was a healthy, outdoors-loving and physically active man.  Although he suffered from arthritis of the knees, he engaged in manual labor for a living and greatly enjoyed a variety of pastimes, including golfing, hunting and fly-fishing.  He had no history of back pain.  *See, e.g.,* Plaintiffs' Exh. 1(1)(A) at 1.  Mrs. Edwards testified that since the accident, her husband is "a totally different person."

18.     The accident affected Mr. Edwards' sexual functioning and, as a result, Plaintiffs no longer have sex.  Mr. Edwards was unable to drive a car for approximately a year-and-a-half after his accident. He can hunt only in modified fashion, from a four-wheeler.  He no longer is able to golf or fly-fish.   Prior to the accident, Mr. Edwards enjoyed engaging in outdoor activities with his grandchildren.  He can no longer play actively with them, take them fly-fishing or play ball with them. He can no longer engage in physical labor for a living.  He pushes his limits to do what he can around the house; Mrs. Edwards tearfully testified that in an attempt to move trash cans from the driveway he bent to retrieve a lid cover and fell, after which he had to crawl to a tree to be able to pull himself back up.  He is either unable to do, or unable to sustain for any length of time, many household chores he had previously performed routinely, such as painting and taking out the trash.  Mrs. Edwards or the couple's sons now do these things.  Most days Mr. Edwards must rest in the afternoon.

19.     Plaintiffs have maintained a positive and accepting attitude, in part because of their strong religious faith, and Mr. Edwards has avoided slipping into depression. However, his temperament has changed.  He becomes frustrated and is apt to be more quick-tempered, sharper and more demanding than when he was able to take care of himself.

7

20.     Mr. Edwards has not worked since the accident.  He receives Social Security Disability payments, which provide considerably less income than he earned while working.  He currently is taking courses in counseling through his church with a view to possibly becoming a counselor or doing chaplaincy work.

21.     Commencing at the time of the accident, Mrs. Edwards took an approximately three-month unpaid leave of absence from her full-time job as a coil operator at Elmet Technologies in Lewiston, Maine to provide emotional support for her husband, attend to necessary renovations to the couple's mobile home and take care of him when he was discharged home.

22.     Mrs. Edwards has felt depressed most of the time since the accident.  Among other things, the change in the couple's social life has been very hard on her.  Prior to the accident, Plaintiffs enjoyed participating with friends in activities such as golfing.  Since the accident, Plaintiffs have been confined to either visiting with friends or going out to dinner with them, and friends have drifted away from Plaintiffs.  Mrs. Edwards no longer plays golf.

23.     The change in the couple's finances also has been distressing to Mrs. Edwards.  She described the couple as having been, prior to the accident, "where everybody likes to be financially – pretty secure, and it's just not there anymore."

24.     Mr. Edwards' accident-related medical charges total $296,611.23, broken down as follows: (i) St. Mary's: $164,550.95, (ii) New England Rehab: $44,953.20, (iii) Maine Medical Center: $234, (iv) Dr. Farrago: $1,086, (v) Dr. Franck: $73,850, (vi) Dr. Snyder: $545, (vii) Central Maine Medical Center: $3,306.17, (viii) Huber Associates, P.A.: $5,156, and (ix) Rite Aid Pharmacy: $2,929.91.  *See* Plaintiffs' Exh. 2.

25.     Dr. McCausland, an arbitrator and economic consultant since 1976 with McCausland Economic Associates, LLC of Contoocook, New Hampshire, and a specialist in analysis of economic

damages, *see* Plaintiffs' Exh. 4, estimates that the present value of Mr. Edwards' economic loss stemming from the accident is $468,320, *see* Plaintiffs' Exh. 3 at 1.  This includes $348,413 for the present value of earning-capacity loss, $23,065 for the present value of fringe-benefit loss and $96,842 for the present value of imputed earning-capacity loss.  *See id*.

26.    Mr. Edwards' lost earning capacity for the years 2002 and beyond is based on his employment as a press room worker for Dingley Press in Lisbon, Maine as of April 2002 and his actual earnings of $38,463.91 in the year 2001.  *See id*. at 2.  Although Mr. Edwards at the time of the accident had begun a sheet-metal business with his son, the enterprise was too new to be the subject of an earning-capacity evaluation.  *See id*.  Dr. McCausland assumed that Mr. Edwards would have retired at age 65 had he remained capable of gainful employment.  *See id*. at 3.  He adjusted Mr. Edwards' hourly wage rate by a 1 percent real increase for each year beyond 2003.  *See id*. at 4.

27.    Imputed earning capacity, often referred to as household services, takes into account services Mr. Edwards provided that directly improved his quality of life and estate without exchange of money, saving the household from expenditures of funds for necessary care and services.  *See id.* at 3.

## II.  Proposed Conclusions of Law

1.    On July 9, 2004 Plaintiffs filed the instant complaint against Wal-Mart and Game Tracker, asserting that Game Tracker, a Michigan corporation, had designed, manufactured and/or distributed the Game Tracker Safety Belt with extension that gave way when worn by Mr. Edwards during his October 11, 2002 hunting trip, causing the injuries of which Plaintiffs complain.  *See* Complaint ¶¶ 2-12, 44.  Plaintiffs sought damages from Game Tracker on theories of strict liability, negligence, breach of warranty and Mrs. Edwards' loss of consortium.  *See id*. ¶¶ 35-55.

9

2.      By motion dated August 20, 2004 Plaintiffs moved for an entry of default against Game Tracker pursuant to Federal Rule of Civil Procedure 55(a) for its failure to answer their complaint or otherwise defend the instant action.  *See* Motion for Default, etc. (Docket No. 7).  The Clerk's Office entered the requested default the same day.  *See* Order (Docket No. 8).

3.      Game Tracker to date has not appeared in this action.  *See generally* Docket.  In or about December 2004 Plaintiffs learned that Game Tracker had filed for chapter 7 bankruptcy in the United States Bankruptcy Court for the Eastern District of Michigan ("Bankruptcy Court").  *See* Joint Motion To Stay (Docket No. 21) & exhibit thereto.

4.      On or about April 22, 2005 Plaintiffs obtained an order from the Bankruptcy Court vacating the automatic stay of any proceedings against Game Tracker to the limited extent of permitting Mr. Edwards to pursue his personal-injury claims so long as any recoveries for said claims were fully paid by proceeds of insurance.  *See* Plaintiffs' Exh. 6.  By order dated January 13, 2006 the Bankruptcy Court, retroactive to April 22, 2004, also permitted Mrs. Edwards to pursue her personal-injury/loss-of-consortium claims with the same condition – that any recoveries for her claims be fully paid by proceeds of insurance.

5.      Plaintiffs have been in contact with insurance carriers for Game Tracker, which have refused to defend and/or indemnify Game Tracker in this litigation.  *See* Default-Judgment Motion at 2 & Exhs. 1-6 thereto.  Plaintiffs requested the instant default judgment and hearing to determine their damages so that they might pursue a reach-and-apply action against the insurers, in accordance with the orders of the Bankruptcy Court.  *See* Default-Judgment Motion at 2.

6.      The entry of default against Game Tracker establishes its liability to Plaintiffs on their theories of strict liability, negligence, breach of warranty and Mrs. Edwards' loss of consortium. "There is no question that, default having been entered, each of plaintiff's allegations of fact must be

taken as true and each of its claims must be considered established as a matter of law." *In re The Home Rests., Inc.*, 285 F.3d 111, 114 (1st Cir. 2002) (citation and internal punctuation omitted).

7.      "A hearing may be required, however, to set damages when the amount is in dispute or is not ascertainable from the pleadings." *Id.; see also, e.g.*, Fed. R. Civ. P. 55(b)(2) (unless a plaintiff's claim is for a sum certain or a sum that can by computation be made certain, "the party entitled to judgment by default shall apply to the court therefor"); *KPS & Assocs., Inc. v. Designs by FMC, Inc.*, 318 F.3d 1, 19 (1st Cir. 2003) ("While a default . . . constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is susceptible of mathematical computation.") (citation and internal punctuation omitted).

8.      Plaintiffs seek an award in the range of $3 million to $4 million to compensate Mr. Edwards for his physical, emotional and economic damages, as well as damages in an amount the court deems appropriate for Mrs. Edwards' loss-of-consortium claim.  *See* Plaintiffs' Brief in Support of Damages (Docket No. 39) at 4.

9.      Mr. Edwards is entitled to economic damages in the amount of $764,931.23, a sum that fairly and justly compensates him for accident-related medical expenses and the present value of his economic loss related to inability to return to his former employment or to provide household services to the degree he had prior to the accident.  *See, e.g.*, 11 M.R.S.A. § 2-715(2)(b) (consequential damages are available to compensate for "[i]njury to person or property proximately resulting from any breach of warranty"); *Goldstein v. Sklar*, 216 A.2d 298, 308 (Me. 1966) (plaintiff injured by defendant's negligence entitled to recover, *inter alia*, sum that would "fairly, reasonably and adequately compensate him for . . . loss due to diminished earning capacity, past and future, proximately ascribable to his injury"); *Swiridowsky v. Kennebec Mental Health Ass'n*, No. CIV.A. CV-98-220, 2000 WL 33675676, at *4 (Me. Super. Ct. Sept. 5, 2000) (plaintiff injured by defendant's

negligence entitled to recover, *inter alia*, "compensation for past and future medical expenses attributable to the injury").[8]

10.     A plaintiff injured by a defendant's negligence is also entitled to recover a sum that fairly, reasonably and adequately compensates him or her for permanent physical impairment, as well as for emotional and physical pain and suffering and loss of enjoyment of life attributable to that negligence. *See, e.g., Hargrove v. McGinley*, 766 A.2d 587, 591 (Me. 2001) ("An award for permanent impairment provides damages to compensate for permanent loss, loss of use, restriction of motion or impairment of some bodily system or member. It addresses losses separate from pain, suffering, mental anguish or medical expenses. Although a condition which constitutes a permanent impairment may result in both medical expenses and pain, suffering and mental anguish, it is also possible to have a permanent impairment without either future pain, suffering and mental anguish or future medical expenses. Thus, permanent impairment, where properly generated, is an element of damages for the jury to consider separately from any other element of damage."); *Goldstein*, 216 A.2d at 308 (plaintiff injured by defendant's negligence entitled to recover, *inter alia*, sum "that would fairly, reasonably and adequately compensate him for his pain and suffering, past and future, mental and physical, as well as for his loss of health . . . proximately ascribable to his injury"); *Swiridowsky*, 2000 WL 33675676, at *4 (plaintiff injured by defendant's negligence entitled, *inter alia*, to "compensation . . . for her pain and suffering and loss of enjoyment of life").

11.     Mr. Edwards suffered fright and pain during and in the immediate aftermath of his harrowing seventeen-foot fall from the tree stand. He has since endured physical pain and suffering, particularly since making an understandable decision to wean himself from pain medications. He is in

---

[8] It is unclear whether Mr. Edwards will succeed in transitioning to counseling or chaplaincy work and, if so, how much he will be able to earn as a result. The Social Security Administration has found him disabled from full-time gainful employment. Thus, I have not factored in any possible future earnings in arriving at his economic loss.

pain a portion of every day and has pain-related difficulty sleeping at night. While Mr. Edwards has not become depressed, and the level of his emotional distress has been tempered by his religious faith, strong family support and his own resilience of character, he experiences humiliation, anxiety and frustration arising from his limitations that is of sufficient magnitude to make him seem, to his wife, to be a different person than he was before the accident – for example, more quick-tempered and demanding. Most notably, although Mr. Edwards made a remarkable recovery given the catastrophic nature of his injuries, he has suffered a severe, permanent bodily impairment that has greatly impacted the quality of his life and will continue to do so. He can no longer have sexual relations with his wife of forty years. He never again will play actively with his eight grandchildren. He was an outdoorsman who loved hunting, fly-fishing and golfing; now he cannot golf or fly-fish (or enjoy those pastimes in the company of others) and can hunt only in modified fashion, from a seated position in a vehicle.

12.     It is difficult to place a dollar figure on suffering and losses of the magnitude of those endured by Mr. Edwards. However, I am satisfied that the sum of $1,000,000 would fairly and justly compensate him for emotional and physical pain and suffering, permanent impairment and loss of enjoyment of life attributable to Game Tracker's wrongful conduct.

13.     I turn next to Mrs. Edwards' claim for loss of consortium. A claim for loss of consortium is based on a tortious injury to the claimant's spouse that "detrimentally affects the spousal relationship." *Gayer v. Bath Iron Works Corp.,* 687 A.2d 617, 622 (Me. 1996) (citation and internal quotation marks omitted). It is a vehicle to compensate the claimant spouse for the loss of material services, guidance, society, companionship, and conjugal relations. *See, e.g., Hardy v. St. Clair,* 739 A.2d 368, 371 n.3 (Me. 1999).

14.     The grievous injuries sustained by Mr. Edwards affected Plaintiffs' spousal relationship detrimentally in many ways. Plaintiffs no longer have a sexual relationship. Mr.

Edwards' temperament has changed for the worse.  The couple has lost friends with whom they formerly enjoyed active pastimes such as golfing, and Mrs. Edwards herself no longer plays golf. Prior to the accident, Mrs. Edwards felt comfortable and secure financially; she and her husband both worked.  After the accident, she took a three-month unpaid leave of absence from work, her husband no longer worked, and she lost her sense of financial security.  While, prior to the accident, Mr. Edwards was healthy and active, and Mrs. Edwards was able to depend on him to perform many household tasks, upon his homecoming from New England Rehab he was still so incapacitated that he required total care, which Mrs. Edwards largely provided.  While he is now physically independent and, for example, no longer needs help with personal hygiene, Mrs. Edwards remains responsible for a greater share of household duties than she was prior to the accident.  For all of these detrimental effects of Mr. Edwards' injuries, Mrs. Edwards is entitled to an award of $200,000.

15.     In addition to damages, Plaintiffs seek interest.  *See* Complaint at 8.  "In a diversity action, such as the present one, state law must be applied in determining whether and how much pre-judgment interest should be awarded."  *Saint-Gobain Indus. Ceramics Inc. v. Wellons, Inc.*, 246 F.3d 64, 69 n.1 (1st Cir. 2001) (citation and internal quotation marks omitted).  The Law Court has "stated that the assessment of prejudgment interest serves two purposes in the ordinary civil context: first, it compensates an injured party for the inability to use money rightfully belonging to that party between the date suit is filed and the date judgment is entered; and second, it encourages the defendant to conclude a pretrial settlement of clearly meritorious suits."  *Guiggey v. Great N. Paper, Inc.*, 704 A.2d 375, 377 (Me. 1997) (citations and internal punctuation omitted).  An award of prejudgment interest serves the first of these two purposes, and is appropriate, in this case.

16.     With respect to civil actions such as this one, in Maine "prejudgment interest is allowed at the one-year United States Treasury bill rate plus 3%."  14 M.R.S.A. § 1602-B(3).  The

"one-year United States Treasury bill rate" is defined to mean "the weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the last full week of the calendar year immediately prior to the year in which prejudgment interest begins to accrue." *Id.* § 1602-B(3)(A). "Prejudgment interest accrues from the time of notice of claim setting forth under oath the cause of action, served personally or by registered or certified mail upon the defendant until the date on which an order of judgment is entered." *Id.* § 1602-B(5). Game Tracker was served notice of the instant action on July 20, 2004. *See* Docket No. 6. The one-year United States Treasury bill rate for the last full week of 2003 (December 26, 2003) was 1.28 percent. *See* http://www.federalreserve.gov/releases/h15/data/wf/tcm1y.txt. Hence, Plaintiffs are entitled to prejudgment interest running from July 20, 2004 to the date of judgment at the rate of 4.28 percent.

### III. Conclusion

For the foregoing reasons, I recommend that the court **GRANT** the Default-Judgment Motion and, consistent with the foregoing, enter judgment in favor of Plaintiffs, and against Game Tracker, as follows:

A.     Awarding Mr. Edwards the sum of $1,764,931.23 on his negligence, strict liability and breach of warranty claims (Counts V, VI and VII of the Complaint).

B.     Awarding Mrs. Edwards the sum of $200,000 on her loss of consortium claim (Count VIII of the Complaint).

C.     Awarding Plaintiffs prejudgment interest at a rate of 4.28 percent accruing from July 20, 2004 through the date of judgment.[9]

---

[9] I do not here address Plaintiffs' request for costs, *see* Complaint at 8, the subject matter of which is covered by Local Rule 54.3.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 20th day of January, 2006.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge

16